1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE EASTERN DISTRICT OF CALIFORNIA

8    MICHAEL S. HICKS,

9             Plaintiff,                    No. CIV S-05-1830 GGH

10        vs.

11
     MICHAEL J. ASTRUE,[1]                   ORDER
12   Commissioner of
     Social Security,
13
              Defendant.
14   _____/

15           Plaintiff seeks judicial review of a final decision of the Commissioner of Social

16   Security ("Commissioner") denying his applications for Supplemental Security Income ("SSI")

17   and Disability Insurance Benefits ("DIB") under Titles XVI and II of the Social Security Act

18   ("Act").[2]  For the reasons that follow, plaintiff's Motion for Summary Judgment is GRANTED,

19   the Commissioner's Cross Motion for Summary Judgment is DENIED, and the Clerk is directed

20   to enter judgment for the plaintiff.

21   \\\\\

22   _____

23        [1]  Michael J. Astrue became Commissioner on February 12, 2007.  Accordingly, he
     should be substituted as defendant in this suit.  Fed. R. Civ. P. 25(d)(1).  No further action need
24   be taken by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §
     405(g).
25
          [2]  The case is before the undersigned pursuant to 28 U.S.C. § 636(c) (consent to proceed
26   before a magistrate judge).

BACKGROUND

Plaintiff, born February 4, 1972, applied on December 22, 2003 for disability benefits.  (Tr. at 45.)  Plaintiff alleged he was unable to work since April 1, 2002, due to bipolar disorder, anxiety, depression, and hepatitis C.  (Tr. at 34, 54, 61.)

In a decision dated March 17, 2005, ALJ Antonio Acevedo-Torres determined plaintiff was not disabled.  The ALJ made the following findings:[3]

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

\\\\\

---

[3]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

3.      The claimant's bipolar disorder, type II is considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4.      These medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The claimant has the following residual functional capacity: perform an unlimited range of work physically and mentally simple routine tasks with limited public contact.

7.      The claimant's past relevant work as car wash attendant did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR §§ 404.1565 and 416.965).

8.      The claimant's medically determinable bipolar disorder, type II does not prevent the claimant from performing his past relevant work.

9.      The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(f) and 416.920(f)).

(Tr. at 21.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A.  Whether Plaintiff's Impairment Met or Equaled Listing 12.04; B.  Whether the ALJ Failed to Provide Specific or Legitimate Reasons to Reject the Opinions of Treating Physician Nguyen or Consulting Physician Dr. Brooker; C. Whether the ALJ Failed to Credit the Testimony of Plaintiff or Lay Witness Berry; and D. Whether the ALJ Erred in Finding Plaintiff Capable of Performing his Past Relevant Work.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v.

1  <u>Chater</u>, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might

2  accept as adequate to support a conclusion.'" <u>Richardson v. Perales</u>, 402 U.S. 389, 402, 91 S. Ct.

3  1420 (1971), quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229, 59 S. Ct. 206

4  (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical

5  testimony, and resolving ambiguities." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1156 (9th Cir.

6  2001) (citations omitted). "Where the evidence is susceptible to more than one rational

7  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

8  <u>Thomas v. Barnhart</u>, 278  F.3d 947, 954 (9th Cir. 2002).

9  <u>ANALYSIS</u>

10       A.  <u>Whether the ALJ Erred in Rejecting the Opinion of Plaintiff's Treating Physicians</u>

11            Plaintiff claims that the ALJ erred in rejecting the treating opinion of Dr. Nguyen,

12  plaintiff's treating psychiatrist at Northgate Point mental health clinic, and consulting

13  psychologist Dr. Brooker.

14            The weight given to medical opinions depends in part on whether they are

15  proffered by treating, examining, or non-examining professionals. <u>Holohan v. Massanari</u>, 246

16  F.3d 1195, 1201 (9th Cir. 2001); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995).[4]  Ordinarily,

17  more weight is given to the opinion of a treating professional, who has a greater opportunity to

18  know and observe the patient as an individual. <u>Id.</u>; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th

19  Cir. 1996).

20            To evaluate whether an ALJ properly rejected a medical opinion, in addition to

21  considering its source, the court considers whether (1) contradictory opinions are in the record;

22

23       [4]  The regulations differentiate between opinions from "acceptable medical sources" and
    "other sources." <u>See</u> 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed
24  psychologists are considered "acceptable medical sources," and social workers are considered
    "other sources." <u>Id.</u>  Medical opinions from "acceptable medical sources," have the same status
25  when assessing weight. <u>See</u> 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific
    regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
26  accordingly are given less weight than opinions from "acceptable medical sources."

1   and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of

2   a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester ,

3   81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may

4   be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating

5   professional's opinion generally is accorded superior weight, if it is contradicted by a supported

6   examining professional's opinion (supported by different independent clinical findings), the ALJ

7   may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

8   Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

9   weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

10   2001),[5] except that the ALJ in any event need not give it any weight if it is conclusory and

11   supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

12   (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

13   881 F.2d at 751.  Likewise, the opinion of an examining physician is entitled to greater weight

14   than the opinion of a nonexamining physician.  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th

15   Cir.1990); Gallant v. Heckler, 753 F.2d 1450 (9th Cir. 1984).  The opinion of a non-examining

16   professional, without other evidence, is insufficient to reject the opinion of a treating or

17   examining professional.  Lester, 81 F.3d at 831.

18           In this case, the ALJ made no attempt to reject the opinion of treating psychiatrist

19   Nguyen.  In summarizing this evidence, he omitted reference to this psychiatrist's finding of a

20   GAF score of 50[6] in July, 2004.[7]  (Tr. at 20, 263.)  This record is more recent than earlier

21

22       [5]  The factors include: (1) length of the treatment relationship; (2) frequency of
   examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
23   (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

24       [6]  GAF is a scale reflecting the "psychological, social, and occupational functioning on a
   hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
25   Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, a GAF of 41-50 indicates:
   "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR
26   any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to

1  assessments of GAF scores of 65 to 70,[8] as assessed by Loaves and Fishes in December, 2002,

2  before plaintiff was in full sustained remission from substance abuse.  Therefore this lower GAF

3  score is probably a more accurate reflection of plaintiff's current state.  This score of 50 was also

4  noted in a July 23, 2003 report, which is also more recent than the Loaves and Fishes assessment.

5  (Tr. at 204.)  Although the ALJ does mention this score from 2003, he does not appear to

6  consider it or reject it.

7          Instead, the ALJ focused on the mental status exams by Dr. Nguyen which he

8  summarized as normal for the most part.  (Id. at 19, 252-70.)  In fact, these exams showed

9  various symptoms of plaintiff's anxiety and bipolar syndrome.  On July 19, 2004, plaintiff's

10  mood was sad and depressed.  (Id. at 261.)  On August 24, 2004, plaintiff was sleeping only two

11  hours a night.  (Id. at 258.)  On November 15, 2004, plaintiff's mood was depressed.  Plaintiff

12  was sleeping only three hours a night.  (Tr. at 255.)  On December 28, 2004, plaintiff was

13  reported to have increased psychomotor activity, anxious mood and congruent affect.  Although

14  mood symptoms had improved, sleep was still a significant issue.  Plaintiff had insomnia which

15  prevented him from sleeping for two days in a row.  When he thereafter got two hours of sleep,

16  he couldn't sleep for two more days after that.  (Tr. at 252.)  At this time, plaintiff was taking

17  Zyprexa and Lamictal.  Seroquel was discontinued.  (Id. at 252-53.)  Other medications

18  prescribed by Northgate Point include Buspar, Paxil, Lithium, Ambien, Wellbutrin, Risperdal,

19  _____

20  keep a job)."
              Thus, contrary to defendant's argument, this GAF score relates directly to

21  plaintiff's ability to work.

22      [7] Plaintiff claims that the ALJ mistakenly refers to Dr. Nguyen's Northgate Point records
   as records from Turning Point; however, the ALJ's reference to a GAF of 50 is from a record

23  dated July 23, 2003, not July, 2004, which is a visit at Turning Point, as described by the ALJ.
   (Tr. at 19, 204; Plaintiff's Mot. at 17, n. 2.)

24

25      [8] A GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild
   insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional

26  truancy, or theft within the household), but generally functioning pretty well, has some
   meaningful interpersonal relationships."  DSM IV at 32.

1   and Trazodone.  (Id. at 264.)  It is true that plaintiff's mood was good at some visits; however,

2   this status was the exception rather than the rule.  (Tr. at 258.)

3          Although the ALJ summarized portions of these treating records, he did not

4   accept them; nor did he specifically reject them.  In light of plaintiff's two most recent GAF

5   scores of 50, one year apart, it was incumbent on the ALJ to discuss these findings, and either

6   reject or accept them.  The ALJ erred in this regard.

7          Turning to the ALJ's rejection of consulting psychologist Dr. Brooker, defendant

8   argues that the ALJ was not required to give reasons for rejecting this opinion because he relied

9   on plaintiff's treating sources.  As highlighted above, the ALJ did not rely on pertinent portions

10  of treating source opinion, especially the low GAF scores.  In fact, the ALJ relied on two

11  nonexamining SA determinations rather than the opinions of these examining professionals.  See

12  Tr. at 18 (finding plaintiff not fully credible because SA determined he could perform simple

13  tasks with limited public contact); tr. at 20 (adopting SA determinations as most reliable and

14  supporting of treating records and plaintiff's daily activities, in regard to residual functional

15  capacity finding).  "The opinion of a nonexamining medical advisor cannot by itself constitute

16  substantial evidence that justifies the rejection of the opinion of an examining or treating

17  physician."  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999).

18         The ALJ rejected Dr. Brooker's 19 page evaluation, deciding to give it only

19  minimal weight because it was inconsistent with the SA (nonexamining) determinations,

20  plaintiff's daily activities, and treating records which indicated no borderline range of

21  intelligence, no need for psychological testing, no memory problems, no significant personality

22  features, no personality disorder, no hospitalizations, no therapy, and no functional limitations.

23  (Id. at 20.)

24         Dr. Brooker's extensive evaluation found that plaintiff's attention span and

25  concentration were significantly diminished in relation to normal limits.  (Id. at 273.)  At the

26  outset, Dr. Brooker specifically noted that there was no evidence of malingering or conscious

7

1   attempts to manipulate the test results.  Therefore, the results were determined to be an accurate

2   reflection of plaintiff's abilities.  (Id. at 278.)  Dr. Brooker administered seven tests in addition to

3   the interview.  He determined that plaintiff had a full scale I.Q. of 81 which is borderline.  (Id. at

4   279.)  Attention, concentration and memory were measured, indicating that overall completion

5   was in the average range due to speed, but concentration was borderline to impaired.  The results

6   showed impulsivity and great preference for speed over accuracy.  (Id. at 281.)  As for

7   interpersonal relationships, the tests showed that plaintiff was impulsive, hostile, impatient and

8   unempathic, with the prediction that plaintiff has short lived and stormy relationships.  Due to his

9   antisocial character features, Dr. Brooker thought plaintiff was likely to be unreliable and

10  irresponsible, as well as being prone to easy anger with difficulty controlling it.  (Id. at 283, 284.)

11          Dr. Brooker's diagnosis was Bipolar I Disorder, severe, and drug and alcohol

12  abuse in sustained full remission.  Axis II contained no diagnosis although mixed personality

13  disorder appeared to be present, but could not be confirmed due to lack of a sustained period

14  without substance abuse.  Features were antisocial, borderline, and obsessive-compulsive.  (Id. at

15  285, 286.)  Plaintiff had related his work history to Dr. Brooker, which included 12 jobs from

16  1990 to 2002, most of which lasted only a few months.  Plaintiff described irritability, anger,

17  frustration, interpersonal conflict, impulsivity, and depressive symptoms on the job which

18  significantly affected his employment.  (Id. at 286.)  Dr. Brooker concluded that plaintiff's

19  bipolar I disorder and personality features described above had prevented plaintiff from keeping

20  any positive social or employment relationship for the last several years, and that it would

21  continue for the foreseeable future.  He did not think plaintiff could function in any vocational

22  setting for more than a few hours at a time.  Prognosis was guarded.  This psychologist thought

23  that plaintiff should slowly add components to his treatment program, with the substance abuse

24  treatment as his primary treatment.  (Id.)  He thought that plaintiff could sustain employment in

25  the future.  (Id. at 287.)

26  \\\\\

1        Dr. Brooker also completed a medical assessment of ability to do work related

2   activities.  He opined that plaintiff had no or a poor ability to relate to coworkers, deal with the

3   public, interact with supervisors, deal with work stress, function independently,[9] and maintain

4   attention and concentration.  (Id. at 288.)   He also thought plaintiff had poor to no ability to

5   understand, remember and carry out detailed or complex instructions, behave in an emotionally

6   stable manner, relate predictably in social situations, and be reliable.  (Id. at 289.)

7        Defendant argues that the ALJ was not required to give reasons to reject Dr.

8   Brooker because he gave controlling weight to plaintiff's treating sources, and that Dr. Brooker's

9   opinion on disability contradicted Drs. Meek and Nguyen who did not find plaintiff disabled.

10   These treating sources were not tasked with determining whether or not plaintiff was disabled,

11   however.  They were sought for treatment only.  Moreover, as explained above, the fact that the

12   SA doctor contradicted Dr. Brooker is not significant as he did not examine plaintiff, and his

13   report was not thorough as was Dr. Brooker's.  As to defendant's claim that Dr. Brooker's report

14   is untrustworthy because it was solicited by plaintiff for his disability case, the ALJ did not give

15   this reason as a basis for rejecting it.  The Commissioner can not posit plausible reasons at this

16   time to support a past decision by the ALJ.

17        Additionally, the most developed and recent SA opinion, although finding that

18   plaintiff could work, nevertheless assessed numerous moderate limitations in his functional

19   capacity.  For example, plaintiff was moderately limited in maintaining social functioning,

20   maintaining concentration, persistence, or pace, performing activities in a schedule, maintaining

21   regular attendance and punctuality, ability to complete a normal workday and work week without

22   interruption, interact appropriately with the public, and respond appropriately to changes in the

23   work place.  These limitations are somewhat inconsistent with the conclusion by these

24   nonexamining doctors that plaintiff could work doing semi-complex tasks and limited contact

25   _____

26        [9]  Dr. Brooker also checked the boxes for good and fair ability to function independently.

9

1  with the public.  In fact, these limitations are not so different from the limitations assessed by Dr.

2  Brooker, who found that plaintiff could only work a few hours a day.

3        Furthermore, although the SA assessments relied on the treating sources,

4  defendant cannot reasonably argue that the ALJ was correct in finding the mental status exams

5  were normal where the treating records contained GAF scores as low as 50.  Dr. Brooker's

6  evaluation was much more comprehensive and internally consistent.

7        Dr. Brooker's opinion is the most extensive development of plaintiff's mental

8  functioning.  The ALJ erred in rejecting it over two nonexamining opinions which consist of

9  check marked forms.  See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983) (expressing

10  preference for individualized medical opinions over check-off reports).  The ALJ's reasons for

11  giving Dr. Brooker's opinion minimal weight were not specific and legitimate reasons supported

12  by substantial evidence in the record.

13        B.  Whether the ALJ Failed to Credit the Testimony of Plaintiff or Lay Witness Berry

14        Plaintiff asserts that the ALJ did not properly address his testimony or that of his

15  caseworker, Ms. Berry in regard to his mental impairment.

16        The ALJ determines whether a disability applicant is credible, and the court defers

17  to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

18  94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

19  credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

20  Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

21  supported by "a specific, cogent reason for the disbelief").

22        In evaluating whether subjective complaints are credible, the ALJ should first

23  consider objective medical evidence and then consider other factors.  Bunnell v. Sullivan, 947

24  F.2d 341, 344 (9th Cir.1991) (en banc).  The ALJ may not find subjective complaints incredible

25  solely because objective medical evidence does not quantify them.  Id. at 345-46.  If the record

26  contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ

10

1   then considers the nature of the alleged symptoms, including aggravating factors, medication,

2   treatment, and functional restrictions.  See id. at 345-47.  The ALJ also may consider the

3   applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or

4   inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

5   and (3) daily activities.[10]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally

6   SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician

7   and third party testimony about nature, severity, and effect of symptoms, and inconsistencies

8   between testimony and conduct, may also be relevant.  Light v. Social Security Administration,

9   119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations,

10  see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for

11  medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Absent

12  affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony

13  must be clear and convincing.  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595,

14  599 (9th Cir. 1999).

15          In this case, the ALJ found plaintiff's mental impairment to be only partially

16  credible based on plaintiff's statements regarding his daily activities, the reports of the SA

17  doctors who determined plaintiff could perform simple routine tasks with limited public contact,

18  and the treating records from Loaves and Fishes and Turning Point.  (Tr. at 18-19.)  First, the

19  ALJ noted that plaintiff stated he stopped working because he had no transportation, yet he was

20  currently getting around by using a bus or bicycle.  (Id. at 18.)  The ALJ also pointed out that

21  plaintiff sleeps three to four hours a night, has no physical limitations, can walk two miles,

22  makes breakfast, watches television, goes to appointments, reads, does laundry, grocery shops,

23

24        [10]  Daily activities which consume a substantial part of an applicants day are relevant.
     "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily
25   activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in
     any way detract from her credibility as to her overall disability.  One does not need to be utterly
26   incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
     (quotation and citation omitted).

1   cleans house, goes to church, visits with family, plays music on Wednesdays, and talks on the

2   phone once a week.  (Id.)  The ALJ also noted plaintiff's testimony regarding problems in

3   functioning but failed to credit them: when he is depressed he is immobilized, has suicidal

4   thoughts, manic behavior, racing thoughts, suicide, delusions, and has no interest in activities.

5   (Id.)

6          The ALJ incorrectly focused on plaintiff's physical abilities, and neglected to

7   consider plaintiff's behavior during manic and depressive episodes as evidenced by the record.

8   There is no dispute that plaintiff has been diagnosed with severe Bipolar Disorder,[11] and no

9   evidence that medications have controlled it.[12]  Plaintiff did testify regarding his daily activities,

10  which are as described by the ALJ, but are sporadic depending on whether he is in a manic or

11  depressive state.  When he is depressed, he can't get out of bed, and does not shower, change his

12  clothes or do anything.  He is immobile and has suicidal thoughts during these time periods.  (Id.

13  at 321, 323.)  He sleeps until 3 or 4 p.m. during these periods.  (Id. at 324.)  If he tries to do

14  something during these depressive stages, he cannot focus.  For example, if he tries to read, he

15  has to read the page over and over again because he cannot concentrate.  (Id.)

16          During the manic stages, plaintiff testified that he has high energy, feelings that he

17  is ten feet tall and bullet proof, scattered sporadic behavior, limited concentration, and racing

18  thoughts.  (Id. at 324-25.)  He may be awake for two nights in a row.  (Id. at 325.)  During these

19  periods, people do not want to be around him and he does not care because he is in his own

20

21          [11]  Plaintiff has been variously diagnosed with type I and type II.  (Tr. at 183, 252, 258,
    285.)

22

23          [12]  Dr. Nguyen wrote that plaintiff reported medications were helping, (Tr. at 206), but
    plaintiff separately reported problems with various medications.  For example, Buspar caused
24  nausea, blurred vision, and tremulousness, which were perturbing to plaintiff.  (Id. at 173.)  On
    May 28, 2003, Paxil was not giving plaintiff relief from his depressive symptoms.  (Id. at 171.)
25  Even Dr. Nguyen had to experiment with various medications, apparently because the results
    were not otherwise satisfactory.  On December 29, 2003, plaintiff reported feeling restless, manic
26  and agitated on Lithium and Trazodone.  At this time Buspar, Paxil, Lithium, Ambien, and
    Trazodone were discontinued.  Zyprexa and Wellbutrin were started.  (Tr. at 183.)

1   world.  (Id. at 327.)  Treating records confirm plaintiff's testimony.  For example, plaintiff

2   reported to Dr. Nguyen that sometimes when he had not slept for two days in a row, he thereafter

3   got two hours of sleep but then could not sleep for two more days after that.  (Tr. at 252.)

4   Whether plaintiff has more depressive or more manic episodes is of no consequence as either

5   type of episode would have a serious impact on his ability to perform substantial gainful activity.

6               It is true, as defendant points out, that plaintiff did not report suicidal ideation

7   over many visits with Dr. Nguyen.  (Id. at 183, 185, 187, 202, 203, 205.)  Nevertheless, he did

8   report thoughts of suicide to Dr. Meek, although he said he would never kill himself.  (Id. at

9   178.)  He also testified regarding his suicidal ideation.  (Id. at 316.)

10             Defendant's claims of conservative treatment which did not require

11   hospitalization or intensive therapy do not necessarily equate to a finding that plaintiff is not

12   credible.  Plaintiff lived at a residential treatment center as long as permitted, and then was

13   transferred to a board and care facility because his case manager did not think he could live on

14   his own.  There is no medical authority for the proposition that hospitalization and therapy would

15   be necessary for plaintiff's mental ailments, assuming they are credible and severe.  Defendant's

16   cite case, Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995), is limited to suggesting a lower

17   level of pain and functional limitation where there is a lower level of treatment.  Defendant has

18   presented no authority for the proposition that the same theory applies to mental illness.

19             Additionally, there was no affirmative evidence of malingering.  Dr. Brooker

20   made a specific point of stating that plaintiff was not malingering and made no conscious attempt

21   to manipulate the test results.  He added, "the results are judged to be a valid reflection of Mr.

22   Hicks' abilities."  (Id. at 278.)  Consequently, the ALJ was required to give clear and convincing

23   reasons for rejecting plaintiff's testimony and he did not do so.

24             Ms. Berry's testimony supports plaintiff's testimony.  An ALJ is required to

25   "consider observations by non-medical sources as to how an impairment affects a claimant's

26   ability to work."  Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  "Lay testimony as to

1    a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or

2    she expressly determines to disregard such testimony and gives reasons germane to each witness

3    for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (citing Nguyen v. Chater, 100

4    F.3d 1462, 1467 (9th Cir. 1996)).  Similar to the ALJ's role in evaluating the testimony of a

5    claimant, when evaluating the testimony of a lay witness "[t]he ALJ is responsible for

6    determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."

7    Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting Andrews v. Shalala, 53 F.3d

8    1035, 1039 (9th Cir. 1995)).

9           The Ninth Circuit has recently held that the ALJ must properly discuss lay witness

10   testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully

11   crediting the testimony, could have come to a different disability determination.  Stout v.

12   Commissioner, 454 F.3d 1050 (9th Cir. 2006).  This standard is extremely high and rivals, if not

13   surpasses the Chapman harmless error standard in criminal law (error harmless only if no

14   reasonable doubt about its lack of effect).

15           The ALJ here rejected this case worker's testimony with a cursory statement that

16   "the testimony by his case manager is not found to be supported by the overall record for the

17   reasons set forth above and was deemed only partially credible."  (Tr. at 20.)

18           Ms. Berry's testimony was that as plaintiff's primary case manager for 17 months,

19   she observed his mental state and it was her opinion that he could not take care of himself.  (Id. at

20   333, 338.)  Plaintiff was at one facility for one year because the program was only twelve months

21   long, but due to plaintiff's chronic depression, staff thought it best for him to be moved to a

22   board and care facility because he was unable to manage his life at that time.  (Id. at 334.)  Ms.

23   Berry testified that plaintiff needs these services which provide him with counseling and getting

24   him to appointments, and that he would need such assistance for a while.  He was not stabilized

25   at this time.  (Id. at 335.)  She described plaintiff when he was in a profound depressive state as

26   not being able to get out of bed.  At this time he did not show or eat well.  He was so isolated that

1  staff had to encourage him to come out.  (Id. at 336.)  At the end of the first program at Palmer

2  House, staff continued to have to prompt him to get out of bed during the depressive stages.

3  When moved to the board and care facility after the one year at Palmer House was over, plaintiff

4  continued to need support to take showers, eat, and take his medication, as well as other daily

5  activities.  Plaintiff could not live on his own.  (Id. at 338.)

6          The ALJ erred in failing to properly assess the testimony of plaintiff's case

7  manager in light of Ninth Circuit authority.

8          C.  Listing 12.04

9          Plaintiff contends that the ALJ erred in failing to find that he meets or equals

10  listing 12.04.  The "Listing of Impairments" ("Listings") describe various impairments of thirteen

11  bodily systems, which presumptively preclude a person from working.  20 C.F.R. Pt. 404, Subpt.

12  P, App. 1.  See Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 404.1520(d).

13  At the third step of the disability analysis, the ALJ determines whether a person's condition

14  either "meets" or "equals" a listing.  A mere *diagnosis* of a listed impairment is not sufficient.

15  Specific findings included in each listing also must be met.  See, e.g., Key v. Heckler, 754 F.2d

16  1545, 1550 (9th Cir. 1985).  Alternatively, other diagnostic tests, or the combined effects of

17  various conditions, may demonstrate the "equivalent" of the specific required findings.  See, e.g.,

18  Sullivan v. Zebley, 493 U.S. 521, 531 (1990); Marcia v. Sullivan, 900 F.2d 172 (1990).  In sum,

19  however, unless an impairment is as severe as and has lasted as long as described in the listing, a

20  person is not presumptively disabled.  Young, 911 F.2d at 183.

21          Plaintiff argues his condition met or equaled Listing 12.04, for affective disorders.

22  In support of this claim, plaintiff cites to his diagnosis of bipolar syndrome, marked restrictions

23  in daily living and social functioning as described by his caseworker Ms. Berry, his GAF scores

24  of 50, and his need to live in a highly supportive living arrangement.

25          Mental Disorders are considered in Part 12 of the Listings. Listing 12.04 deals

26  with "Affective Disorders."  The Listing is comprised of three parts, labeled  "A," "B," and "C."

Both parts A and B of the listing must be met or equaled.  Alternatively, Part C must be met or equaled.  The Part A criteria determine whether evidence of a depressive disorder is present.  20 C.F.R. Part 404, Subpt.  P, App. 12.04(A).  The Part B criteria evaluate the functional loss resulting from a depressive disorder.  See, e.g., Cruse v. U.S. Dept. of Health & Human Services, 49 F.3d 614, 616 (10th Cir. 1995).  Part C criteria requires a medically documented history of chronic affective disorder lasting at least two years.  The ALJ found plaintiff met the "A" criteria, and this finding is not in question.

        Listing 12.04(B) requires at least two of the following functional limitations:

        1.  marked restriction of activities of daily living;

        2.  marked difficulties in maintaining social functioning;

        3. deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or

        4. repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms.

"Marked" means "more than moderate, but less than extreme."  See Listing12.00(C).

        Paragraph C requires demonstration of one of the following: (1) repeated and extended episodes of decompensation; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C)(1)-(3).

        In regard to subsection (B), the ALJ found that plaintiff did not meet these criteria because his daily activities were only mildly limited according to the State Agency determinations, treating records, and plaintiff's account of his daily activities in the record and at hearing.  (Tr. at 19.)  The ALJ further found that social functioning was only mildly to

16

1  moderately limited, and that ability to maintain concentration, persistence or pace was only

2  moderately limited, based on most of these same records.  The ALJ also found no evidence of

3  extended episodes of decompensation.  (Id.)

4          As to subsection (C), the ALJ simply recited the criteria and summarily concluded

5  that the evidence did not document more than a minimal limitation on his ability to work and no

6  evidence that plaintiff had met one of the three criteria provided by this subsection.  (Tr. at 20.)

7          The State Agency physician performed two mental assessments based on the

8  medical records.  It was determined that plaintiff did not meet listing 12.04.  (Tr. at 227.)  In one

9  of the evaluations, Dr. Regan did assess bipolar syndrome with a history of episodic periods,

10  anxiety, history of amphetamine and heroin dependence, and history of alcohol dependence in

11  partial remission.  (Id. at 230, 232, 235.)  Plaintiff was found to be mildly limited in activities of

12  daily living, and moderately limited in maintaining social functioning and in maintaining

13  concentration, persistence and pace.  (Id. at 237.)  Plaintiff was moderately limited in maintaining

14  attention and concentration for extended periods, performing activities in a schedule, maintaining

15  regular attendance and being punctual, being able to complete a normal work day or work week

16  without interruption, being able to interact with the public, maintaining socially appropriate

17  behavior including neatness and cleanliness, and responding appropriately to changes in the

18  workplace.  (Id. at 241-42.)  The conclusion was: "capable of at least SRT, based on prior work,

19  most likely capable of semi-complex.  Needs limited contact with the public due to anxiety and

20  affective disorder."  (Id. at 243.)

21          As analyzed in the previous sections, the SA opinions were improperly relied on

22  by the ALJ, and other evidence fulfills the requirement of part B.  The GAF scores of 50 as

23  assessed twice by plaintiff's treating doctors support the criteria of marked restriction of

24  activities of daily living and maintaining social functioning.  (Id. at 263, 204.)  Symptoms of this

25  score are serious and  may include "suicidal ideation, severe obsessional rituals, frequent

26  shoplifting" or "no friends, unable to keep a job."

The ALJ also improperly rejected the consulting opinion of Dr. Brooker which is now credited.  Dr. Brooker's testing indicated plaintiff was impulsive, hostile, impatient and unempathic, with the prediction that plaintiff has short lived and stormy relationships.  This psychologist thought plaintiff had antisocial character features which would cause him to be unreliable and irresponsible, as well as being prone to easy anger with difficulty controlling it. (Id. at 283, 284.)  He opined that these personality features had prevented plaintiff from keeping any positive social or employment relationship for the last several years, and that it would continue for the foreseeable future.  He did not think plaintiff could function in any vocational setting for more than a few hours at a time.

As outlined previously, Dr. Brooker completed a medical assessment of ability to do work related activities.  He opined that plaintiff had no ability or at most a poor ability to relate to coworkers, deal with the public, interact with supervisors, deal with work stress, function independently,[13] and maintain attention and concentration.  (Id. at 288.)  He also thought plaintiff had no to poor ability to understand, remember and carry out detailed or complex instructions, behave in an emotionally stable manner, relate predictably in social situations, and be reliable.  (Id. at 289.)  This opinion satisfies both the second and third criteria of subdivision (B).

Furthermore, the improperly rejected testimony of plaintiff and his case manager support his marked restrictions in daily living and social functioning.  As set forth in the previous section, both plaintiff and Ms. Berry testified that when he is in a depressive state, he can not get out of bed, take a shower, change his clothes, or eat without coaxing.  For these reasons, Ms. Berry testified that he was not released after his twelve month maximum stay at Palmer House, but the recommendation was made that he move to a board and care facility due to his continued need for assistance in accomplishing these daily activities.  (Id. at 338.)

---

[13]  Dr. Brooker also checked the boxes for good and fair ability to function independently.

1    It can not be disputed that the (C) criteria is also satisfied.  Plaintiff lived in a

2    highly supportive living arrangement for more than one year, with the credited opinion of his

3    case manager that he continued to need such an environment for the future.  (Id. at 335.)

4    In light of the ALJ's failure to properly credit treating source evidence and the

5    consulting opinion of Dr. Brooker, as well as his improper credibility finding, the ALJ's finding

6    that plaintiff did not meet or equal the listings is not based on the proper legal standards or

7    supported by substantial evidence in the record.[14]

8    CONCLUSION

9    The decision whether to remand a case for additional evidence or simply to award

10   benefits is within the discretion of the court.  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.

11   1990).  If additional administrative proceedings would remedy the defects in the decision,

12   remand is appropriate.  Salvador v. Sullivan, 917 F.2d 13, 15 (9th Cir. 1990); Barbato v.

13   Commissioner of Social Security Admin., 923 F. Supp. 1273, 1277-78 (C.D.Cal. 1996).  The

14   court concludes that little is to be gained from remand.  There appears to be no justifiable reason

15   to reject the treating and examining physicians' limitations.  The ALJ's assessment of the

16   testimony of plaintiff and his case worker was not harmless.  Both the physicians' opinions and

17   this testimony may now be credited as a matter of law.  Lester v. Chater, 81 F.3d 821, 834 (9th

18   Cir. 1995).  The record is complete in this regard.

19   Accordingly, plaintiff's Motion for Judgment for Summary Judgment is

20   GRANTED, the Commissioner's Cross Motion for Summary Judgment is DENIED, and the

21   \\\\\

22   \\\\\

23   \\\\\

24   \\\\\

25

26   [14]  Because this court finds that plaintiff meets the listings, it is unnecessary to address the final issue of whether the ALJ erred in finding plaintiff could do his past work.

1   Clerk is directed to enter Judgment for the plaintiff.  This case is remanded for a computation of

2   benefits only.

3   DATED: 3/13/07                                    /s/ Gregory G. Hollows

4                                                     _____
                                                      GREGORY G. HOLLOWS
                                                      U.S. MAGISTRATE JUDGE
5   GGH/076
    Hicks1830.ss.wpd

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26